IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

QUINCY POWELL,                          No. C 10-3154 CW (PR)

         Petitioner,                    ORDER DENYING PETITION FOR
                                        WRIT OF HABEAS CORPUS;
    v.                                  DENYING CERTIFICATE OF
                                        APPEALABILITY
JAMES YATES, Warden,

         Respondent.
_____/

    Petitioner Quincy Powell, a state prisoner, has filed a pro se

petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254,

alleging the following four claims: (1) his trial counsel was

ineffective for failing to move to sever the charges pertaining to

the two incidents for which he was convicted; (2) the trial court

violated his due process rights by admitting evidence of the

victim's breast cancer and treatment; (3) the prosecutor's closing

argument violated due process; and (4) cumulative error.  (Pet.

"Argument" at 13-37.)[1]  On August 6, 2010, the Court issued an

order to show cause why the present writ should not be granted.  On

December 6, 2010, Respondent filed an answer.  On March 14, 2011,

Petitioner filed a traverse.

    Having considered all of the papers filed by the parties, the

Court DENIES the petition.

PROCEDURAL BACKGROUND

    An amended grand jury indictment charged Petitioner with eight

offenses.  The first seven pertained to crimes against a single

_____

    [1] Attached to Petitioner's seven-page petition form are
multiple pages of supporting documents, including a document
labeled, "Argument."  Petitioner has numbered the pages of this
document as pages thirteen through thirty-seven.  The Court will
use Petitioner's page numbering when citing to this document.

United States District Court
For the Northern District of California

victim, Alice K. (Alice), including: robbery; three counts of forcible rape; forcible sodomy; and forcible oral copulation.  The eighth count alleged that Petitioner robbed a teller at Wells Fargo Bank on the same day.  The indictment further charged Petitioner with using a deadly and dangerous weapon (a cutting instrument) as to certain offenses.  In addition, the indictment alleged that Petitioner had three prior convictions, three prior prison terms, and one prior conviction.  A serious felony allegation was added in an amended indictment.  The matter proceeded to a jury trial on all counts, and the prior conviction allegations were bifurcated.

On February 5, 2007, a jury found Petitioner guilty on all charges.  The jury also found that the weapon use allegations were true.

On April 20, 2007, the trial court found that the allegations of all the priors were true.

On June 29, 2007, the trial court sentenced Petitioner to a twenty-year determinate term plus three consecutive terms of twenty-five years to life, which is a total term of ninety-five years to life in prison.

Petitioner filed a timely appeal to the California Court of Appeal.  On April 30, 2009, the state appellate court affirmed the trial court's judgment and remanded the matter for resentencing.  The trial court resentenced Petitioner to a term of 141 years to life.  The state appellate court upheld the sentence, and Petitioner has not raised any contention pertaining to that matter.

Petitioner subsequently filed a petition for review in the California Supreme Court.  On July 29, 2009, that court denied review.

**United States District Court**
For the Northern District of California

On July 19, 2010, Petitioner filed the present federal habeas petition.

FACTUAL BACKGROUND

The state appellate court summarized the facts of the case as follows:

A. Prosecution Case

1. Crimes Against Alice

Victim Alice testified that a man knocked on the door of her residence in the morning of October 3, 2005, said he had a problem with his car, and asked if she could help him jump-start his vehicle. At trial, Alice identified the man as appellant Powell, asserting she was "one-hundred percent certain" of the identification.

Alice agreed to help, thinking Powell's car was parked across the street. She walked out of her house to her car, which was parked in her driveway. When she got in, Powell jumped into the passenger seat and said his car was at a bend in the road. Alice drove toward the bend but did not see a car there. Powell told her she was "really stupid" to open her door for him, but not to worry because he was "a man of God ... on drugs" and only needed money.

Alice told Powell she did not have much money because she worked at a local high school. Powell replied that he had attended that school and asked if she knew a "Miss Powell." Powell assured Alice that he would not hurt her, saying that when he first saw her earlier that morning, opening her front door to take out the trash, he thought she was a "dude." Over defense counsel's objection, Alice explained to the jury that, at the time of the incident, her hair was short because it had not fully grown back after chemotherapy.

Alice told Powell that she did not have any money with her, but she would give him money she had at her home. She drove back to her house with Powell, very afraid. She asked Powell to wait outside the house while she got the money, but he pushed his way inside behind her.

Alice gave Powell $30 from her wallet. He insisted it was not enough, and she replied it was all she had. Taking the money, Powell headed toward the front door and instructed Alice to sit on an ottoman and not call the police. At the door, however, Powell stopped, turned around, looked at Alice, and told her to take off all her clothes. When she refused, Powell asked, "do you want to live or not?" Alice took off her clothes

3

except for her underwear.  Powell told her to remove her underwear, she refused, and Powell again asked, "do you want to live or not?"  Alice complied and was terrified. Powell began to remove his clothing, including a dark sweatshirt, and ordered her to spread her legs.  Alice then noticed he had a box cutter or "exacto" knife in his hand; she complied with his demands out of fear, thinking he might kill her.

Powell tried to insert his penis into Alice's vagina.  As he did, he touched her breast.  Alice told him that her breast was not real and she had been sick with cancer.  Powell replied, "Don't be such a crybaby."

After penetrating her and thrusting for a few minutes, Powell said something like, "this isn't working."  He removed his penis and ordered her to the floor.  When she complied, he again penetrated her vagina.  A few minutes later Powell became frustrated, said "this isn't working" and "[i]t will have to be doggie-style."  He removed his penis and told her to turn over on her stomach.  After she did so, he penetrated her vagina a third time and then penetrated her anus.  When she screamed in pain, he told her to be quiet.  Powell next ordered her to the ottoman and demanded she "suck" his penis.  She said she could not do it, and he again asked, "do you want to live or not?" Alice complied.

Still unable to ejaculate, Powell was angry and frustrated.  He removed his penis and told her: "This is not working" and something like, "Oh, I give up.  Just give me the money and the goh."  Alice did not know what "goh" was until he demanded her jewelry; she then realized he meant "gold."  When Alice told Powell she had no jewelry, he brought his hand down hard on her neck in anger; she felt a liquid dripping down her body and realized he had stabbed her with the box cutter.

Bleeding "all over the floor" and believing she was going to die, Alice went to the kitchen.  When she saw that Powell was rifling through her purse in the dining room, she ran out the front door to a neighbor's house.

Neighbor Celestia Reynolds testified that she heard yelling that morning around 6:30 a.m.  She looked out her door and saw Alice running down the street without any clothes, crying for help.  "Very, very upset" and quite frightened, Alice explained that a man had robbed her and tried to rape her.  Reynolds called the police.

The police arrived soon afterwards.  They found on the floor a black sweatshirt that did not belong to Alice, as well as broken glass and blood.

Alice was transported to the hospital.  Diana

4

Cummings, a forensic nurse practitioner, conducted a sex assault rape trauma (SART) examination.  A puncture wound on the side of Alice's neck was consistent with her claim that she had been stabbed.  Bruising and a scratch on Alice's neck indicated attempted strangulation.  Multiple contusions and lacerations in Alice's vaginal area, as well as a hematoma and contusion in her anal area, were indicative of non-consensual sex.

Criminalist Alice Neumann testified that DNA on a swab taken from Powell's mouth matched DNA from the sweatshirt police found in Alice's house.  Powell's DNA also matched DNA found in Alice's underwear, which had tested positive for the presence of semen.  According to Neumann, that particular DNA profile occurs only once in every 780 million of those who self-report as "African-American," once in every 3.4 billion Caucasians, and once in every 15 billion Hispanics.

Detective James Simpson testified that he interviewed Powell on October 12, 2008.  Powell initially appeared forthright, but he became very quiet when Simpson described the assault on Alice, at one point becoming teary-eyed.  Powell said he attended the high school where Alice worked and knew "Ms. Powell" there.  Simpson obtained corroborating evidence that Powell had attended the school.

After the incident, the police showed Alice a set of six photographs, which included a photograph of Powell.  Alice was unable to point out her assailant with 100 percent certainty.  At trial, however, she explained that she was 100 percent certain of her identification of Powell in the courtroom because "when you have a living human being in front of you rather than a photograph, it is possible to recognize traits that you have seen before."

## 2.  The Bank Robbery

On the same morning as the attack on Alice, Refugio Huerta was working as a teller at the Redwood City branch of Wells Fargo Bank.  At approximately 10:45 a.m., a man wearing a red beanie approached and handed her a note that read, "I have a gun."  Frightened, Huerta gave the man $6,360 from her cash drawer, and he left the bank with the money.  At trial, Huerta was not 100 percent sure Powell was the robber, because by the time of trial Powell had grown facial hair.  He did, however, bear similarities to the robber.  In addition, Huerta identified a red beanie, later found outside the bank, as the beanie worn by the robber.

Elena Garcia, another bank teller working during

5

**United States District Court**
For the Northern District of California

the robbery, recalled that the robber wore a silver jacket and a red beanie. When shown a photo array by a police officer after the crime, she almost immediately pointed to Powell's picture and said, "that's probably the one." At trial, Garcia did not identify Powell as the robber, asserting that no one in court looked familiar.

David Shummers, working a quarter-block from the bank, saw a "black" man run by him on the street on the day of the robbery. Shummers later noticed the man had dropped a red beanie and informed the police. The police recovered the red beanie at the scene. DNA testing revealed that Powell was a major contributor of the DNA found on the beanie.

Two days after the robbery, police detective Jacqueline Gouldson asked Powell if he had a gun during the bank robbery in Redwood City. Powell said "no". He then said something to the effect of, "it doesn't matter; my life is over anyway." He put his head down and started to cry.

LaBatiste Heath testified that on October 3, 2005, at around 9:00 a.m. -- between the time of the attack on Alice and the bank robbery in Redwood City -- she was at a house in East Menlo Park smoking crack cocaine with another woman. Powell came by the house and joined them. He seemed "kind of uneasy." He claimed he had to go to Redwood City to pick up a check from his lawyer for an inheritance. She and the other woman drove him to Redwood City in a van. At their destination, Powell, wearing a cap or beanie, got out of the van. He returned about seven minutes later, got in the van, and instructed the driver, "go, go." Heath identified Powell in the bank's security photographs of the robbery.

                    B. Defense Case

Powell did not testify at trial and did not offer any substantial affirmative evidence on his behalf.

(People v. Powell (Op.), No. A119300, 2009 WL 1164975 (Cal. Ct. App. Apr. 30, 2009) at *1-4.)

                    LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death

United States District Court
For the Northern District of California

Penalty Act of 1996 (AEDPA), a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412 (2000). The first prong applies both to questions of law and to mixed questions of law and fact, id. at 407-09, and the second prong applies to decisions based on factual determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ.

United States District Court
For the Northern District of California

1   <u>Id.</u> at 409.

2        "Factual determinations by state courts are presumed correct

3   absent clear and convincing evidence to the contrary." <u>Miller-El</u>,

4   537 U.S. at 340.  A petitioner must present clear and convincing

5   evidence to overcome the presumption of correctness under

6   § 2254(e)(1); conclusory assertions will not do.  <u>Id.</u>  Although

7   only Supreme Court law is binding on the states, Ninth Circuit

8   precedent remains relevant persuasive authority in determining

9   whether a state court decision is objectively unreasonable.  <u>Clark</u>

10  <u>v. Murphy</u>, 331 F.3d 1062, 1069 (9th Cir. 2003).

11       If constitutional error is found, habeas relief is warranted

12  only if the error had a "'substantial and injurious effect or

13  influence in determining the jury's verdict.'"  <u>Penry v. Johnson</u>,

14  532 U.S. 782, 795 (2001) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S.

15  619, 638 (1993)).

16       When there is no reasoned opinion from the highest state court

17  to consider a petitioner's claims, the court looks to the last

18  reasoned opinion of the highest court to analyze whether the state

19  judgment was erroneous under the standard of § 2254(d).  <u>Ylst v.</u>

20  <u>Nunnemaker</u>, 501 U.S. 797, 801-06 (1991).  In the present case, the

21  California Court of Appeal is the highest court that addressed

22  Petitioner's claims.

23                              DISCUSSION

24  I.   Ineffective Assistance of Trial Counsel for Failure to Move to
         Sever the Charges Pertaining to Two Incidents

25
         Petitioner contends that his trial counsel was ineffective for

26  failing to move to sever charges pertaining to the sexual assault

27  and the bank robbery.  (Pet. "Argument" at 13.)

28

**United States District Court**
For the Northern District of California

The state appellate court rejected this claims as follows:

A.   Ineffective Assistance for Failing to Move for Severance

To prevail on a claim of ineffective assistance of counsel, a defendant must show: (1) counsel's performance was deficient because his representation fell below an objective standard of reasonableness under prevailing professional norms; and (2) prejudice flowing from counsel's performance or lack thereof.  (People v. Lucas (1995) 12 Cal.4th 415, 436.)  Powell contends his trial counsel should have moved to sever the bank robbery count.  He therefore must show that reasonably competent counsel would have moved for severance, the motion would have been successful, and it is reasonably probable he would have obtained a more favorable outcome if the counts had been severed.  (People v. Grant (1988) 45 Cal.3d 829, 864-865.)  Like respondent, we will focus on the last two elements.

1.   Potential Success of a Severance Motion

Section 954 provides that a trial court may order severance of joinable offenses "in the interests of justice and for good cause shown."  Severance of the charges may be constitutionally required only if joinder "would be so prejudicial that it would deny a defendant a fair trial."  (People v. Musselwhite (1998) 17 Cal.4th 1216, 1243-1244.)

Factors to consider in reviewing a court's denial of a severance motion include: "(1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case. [Citation.]"  (People v. Mendoza (2000) 24 Cal.4th 130, 161.)  We apply these factors to determine whether the trial court would have granted the motion if it had been made.

Powell fails to demonstrate that the severance motion would have been granted.  He argues that the evidence of the assault on Alice would not have been admissible in the bank robbery case.  However, in light of Powell's claim that the identity of the bank robber was at issue, the evidence that Powell had committed an armed robbery of Alice just hours earlier might arguably have been admissible in the bank robbery case to supplement the evidence that his DNA matched the DNA

profile of the bank robber.  In addition, since there
was a DNA link between Powell and the perpetrator in
both cases, evidence concerning DNA testing procedures
would have been admissible in both cases.  There was,
therefore, some overlap or cross-admissibility of the
evidence.  Moreover, even if the evidence was not
cross-admissible, this is not an instance in which a
weak robbery case was joined with a strong sexual
assault case.  There clearly was a bank robbery, and
there was ample evidence Powell did it.  The bank's
security photographs showed Powell in the bank during
the robbery, one teller identified him as the robber in
a photographic lineup, and another teller stated that
Powell appeared similar to the robber.  Powell's DNA was
found in a cap the robber dropped while fleeing the
bank.  Under the circumstances, it is unlikely the trial
court would have found good cause to sever the counts
and require separate trials.

    2.   Probability of a More Favorable Result

    Even if the severance motion had been granted,
there is no reasonable probability Powell would have
obtained a more favorable outcome.  He insists the
sexual assault evidence "necessarily instilled a desire
on the part of the jury to punish appellant severely for
his misdeeds against [Alice]," and the jury could not
have been expected to give Powell "fair consideration"
on the bank robbery count because the jury was
"overwhelmed by the inflammatory evidence of the sexual
assault."  Jurors, however, take their sworn duties far
more seriously than Powell supposes.

    The fact that Powell sexually assaulted Alice while
robbing her did not compel the jury to conclude he also
committed the bank robbery.  To the contrary, Powell's
conviction was a product of the overwhelming evidence
that Powell was the one who robbed the bank: the
testimony of the person who drove him there and
identified him in the security photograph of the
robbery, two tellers who identified him as the robber,
and his own DNA, which matched DNA found on the robber's
cap.  While teller Huerta testified she could not be
"one hundred percent" sure that Powell was the bank
robber because of his facial hair, she stated he was
similar to the robber and identified the red beanie
(with Powell's DNA) as the cap the robber wore.  Teller
Garcia could not identify Powell in court but identified
him in a photographic lineup.  The DNA evidence linking
Powell to the crime was undisputed. In addition,
Powell's involvement in the bank robbery was shown by
his response to Detective Gouldson's question about
whether he had a gun at the bank robbery: although
denying his use of a gun, Powell said his life was over
anyway and cried.

**United States District Court**
For the Northern District of California

1
2
3
4

>         Because there is no reasonable probability that
>     Powell would have obtained a better verdict, he cannot
>     establish that his counsel's failure to move for
>     severance of count eight compels reversal of his
>     conviction.

(Op. at *5-6.)

Here, in order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must show: first, that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is defined as a probability sufficient to undermine confidence in the outcome. Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Id. at 689. A difference of opinion as to trial tactics does not constitute denial of effective assistance. United States v. Mayo, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir. 1984).

The Strickland framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for

the purposes of 28 U.S.C. § 2254(d) analysis.  See Williams, 529

U.S. at 404-08.

Here, the state appellate court held that under California law

a severance motion would have been futile.  (Op. at *5-6.)  The

state appellate court's interpretation of California law is binding

on this Court.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005)

(state court's interpretation of state law, including one announced

on direct appeal of challenged conviction, binds federal court

sitting in habeas corpus).  Counsel's failure to make such a

motion, therefore, could not have constituted ineffective

assistance.  See Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir.

2005).

Moreover, even if his trial counsel's performance was

deficient, Petitioner has not established prejudice; that is, he

has not shown that there was a reasonable probability of a more

favorable result had the cases been severed.

"There is no prejudicial constitutional violation unless

'simultaneous trial of more than one offense . . . actually

render[ed] petitioner's state trial fundamentally unfair and hence,

violative of due process.'"  Sandoval v. Calderon, 241 F.3d 765,

772 (9th Cir. 2000) (quoting Featherstone v. Estelle, 948 F.2d

1497, 1503 (9th Cir. 1991)).  "This prejudice is shown if the

impermissible joinder had a substantial and injurious effect or

influence in determining the jury's verdict."  Id.  Factors that

may be considered in determining whether joinder is unduly

prejudicial include the joinder of other crimes where the evidence

would otherwise be inadmissible and the joinder of a weak

evidentiary case with a strong one.  See id.

12

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Here, the state appellate court concluded that this was "not an instance in which a weak robbery case was joined with a strong sexual assault case." (Op. at *5.)  The court found that there was overwhelming evidence that Petitioner committed the robbery.  The court also found that the evidence linking Petitioner to the robbery was undisputed.  Thus, the court concluded that Petitioner's assertion -- that the jury was "overwhelmed by the inflammatory evidence of the sexual assault," (id. at *6), -- was insufficient to establish prejudice.

As mentioned above, a danger of prejudice arises when a strong case is joined with a weak case, in that the jury could impermissibly infer "because he did it before, he must have done it again." Bean v. Calderon, 163 F.3d 1073, 1085 (9th Cir. 1998) (quoting United States v. Bagley, 772 F.2d 482, 488 (9th Cir. 1985)).  However, in the present case, the evidence supporting the robbery charge was neither weak, nor significantly less compelling than the evidence supporting the sexual assault.  In proving the robbery charge and rebutting Petitioner's claim that the identity of the bank robber was at issue, the state offered photographic evidence and witness testimony in order to identify Petitioner as the perpetrator.  The state also presented DNA evidence linking Petitioner to a cap the robber dropped while fleeing the bank.  Therefore, the state appellate court was not unreasonable in its determination that because the evidence regarding neither charge was weak, there was no danger of a "spillover" effect from a stronger case to a weaker case.  See People v. Sandoval, 4 Cal. 4th 155, 173 (1992).  Finally, the state appellate court's findings are reasonable because, although Petitioner claims that he was

United States District Court
For the Northern District of California

1   prejudiced, his conclusory assertions fail to support such a

2   finding.  See Rios v. Rocha, 299 F.3d 796, 813 n.23 (9th Cir. 2002)

3   (rejecting two ineffective assistance of counsel claims based on

4   petitioner's failure to produce evidence of prejudice).

5       The state appellate court's rejection of Petitioner's

6   ineffective assistance of counsel claim was not contrary to or an

7   unreasonable application of Strickland.  Accordingly, this claim is

8   DENIED.

9   II.  Due Process Violation for Admission of Breast Cancer Evidence

10      Petitioner claims that the trial court abused its discretion

11  by admitting evidence of Alice's breast cancer and treatment.

12      The following factual background for this claim has been taken

13  from the state appellate court's decision:

14          Before the charged offenses, Alice had undergone a
        mastectomy, reconstructive surgery, and four rounds of
15      chemotherapy for breast cancer.  Due to the
        chemotherapy, she had lost most or all of her hair.  It
16      was still very short at the time of the charged crimes.

17          Powell moved in limine to exclude portions of
        Alice's medical records that noted her mastectomy and
18      cancer treatment.  The prosecutor asserted the evidence
        was relevant to establish that any medication Alice was
19      taking at the time did not affect her ability to
        recollect the assault.  Powell's attorney responded he
20      was not going to raise such a challenge.  The prosecutor
        further argued that the evidence of Alice's condition at
21      the time of the offense was relevant to explain Powell's
        comment to Alice that he first thought she "was a dude"
22      and to establish why she did not physically resist the
        assault.  The court deferred its ruling.
23
            Powell also moved to exclude statements Alice made
24      about her cancer treatment to nurse Cummings, which
        Cummings had recorded in notes she made during the SART
25      examination.  Powell argued the notations were hearsay
        and irrelevant.  The prosecutor responded that the
26      evidence was relevant to Alice's credibility and state
        of mind, and admissible under Evidence Code section 1250
27      as declarations of her physical and mental state when
        she spoke to Cummings.
28

14

The trial court ruled that the medical history references in the medical records were admissible.  The court explained in part: "I'm going to find that the history, the medical history, the upper-left-hand corner of page 2 is relevant to the course of treatment that [Alice] was going to follow after her examination at the emergency room.  It is obviously necessary to take a medical history in order to treat a person properly. [¶]  So, the mastectomy, the reconstructive, the four rounds of chemo and the medication she was on is all relevant, because that could influence the medications that are eventually prescribed to her in connection with this case, as are any preexisting injuries that she reported to the nurse."

At trial, evidence was presented regarding Alice's medical condition and treatment.  Alice testified, in explaining Powell's statement that he initially thought she was a "dude," that she had lost hair due to chemotherapy.  She also testified that when Powell touched her breast, she told him the breast was not real and she had undergone cancer surgery.  In addition, Alice explained that her mastectomy and reconstructive surgery had left a long scar on her torso.  Nurse Cummings testified that during her examination of Alice she learned that Alice had undergone chemotherapy and observed that Alice's surgical wound had not completely healed.

(Op. at *6-7.)

Petitioner argues that evidence of Alice's breast cancer and treatment (1) was not relevant, (2) was unduly prejudicial, and (3) was a violation of his due process rights, which rendered his trial fundamentally unfair.

The state appellate court rejected these claims as follows:

[T]he evidence concerning Alice's cancer and treatment was not entirely irrelevant.  As the trial court noted, her prior medical condition and treatment were germane to her medical condition at the time of the incident and her subsequent medication, which was relevant to her ability to perceive or recollect the events.  On the other hand, the materiality of such evidence was slight, since Powell's attorney indicated he would not (and did not) challenge Alice's credibility on that basis.  Alice's breast cancer and related medical treatment were also relevant to explain Powell's "I thought you was a dude" remark, although respondent does not explain why the prosecutor needed to introduce that remark.  To the extent the evidence of Alice's

15

medical condition showed a weakened physical condition, it was relevant to Alice's credibility in claiming that she did not consent to the sex acts and that Powell perpetrated his crimes by force or threat of force. In short, there was some probative value to the evidence, and the court did not abuse its discretion in admitting it over defense counsel's relevance objection.

Powell argues that the evidence, even if marginally relevant, was nonetheless inadmissible under Evidence Code section 352, because its slight probative value was outweighed by the unduly prejudicial effect of its inflammatory nature. In particular, Powell urges, he was prejudiced by Alice's testimony that he told her not to be a "crybaby" when he learned of her medical condition. However, defense counsel did not object when Alice testified about Powell's crybaby statement. Nor did defense counsel object to any of the evidence concerning Alice's medical condition or treatment on the ground it was inadmissible under Evidence Code section 352. His objections under that statute are therefore forfeited and waived.[FN2]

[FN2.] Powell contends his trial counsel provided ineffective assistance by failing to object to the evidence under Evidence Code section 352. He does not establish, however, that an objection on that ground would have yielded a more favorable outcome at trial. Powell also argues that his counsel was remiss in failing to move to strike testimony and failing to move for a mistrial when it became apparent that the prosecutor was using the evidence to invoke sympathy toward Alice and anger toward Powell. Again, however, in view of the quantity and quality of the evidence against Powell, there is no reasonable probability he would have obtained a more favorable result if his counsel had brought a motion to strike the evidence or a motion for a mistrial.

Not only does Powell fail to establish error in the admission of the evidence of Alice's medical condition and treatment, he does not establish a reasonable probability of a more favorable result if the challenged evidence had been excluded. (People v. Mullens (2004) 119 Cal.App.4th 648, 658-659.)[FN3]

[FN3.] Because admission of the evidence did not violate Powell's constitutional rights to a fair trial and due process of law, the Chapman harmless error standard does not apply. (Chapman v. California (1967) 386 U.S. 18, 24.) Even if we applied that standard, we would still conclude any error in the

United States District Court
For the Northern District of California

admission of the evidence was harmless.

In the first place, the evidence that Powell committed the offenses in counts one through seven was overwhelming and not substantially disputed.  The fact that Powell was the perpetrator was established by Alice's "one hundred percent certain" identification of him at trial, evidence that he attended the high school that the robber attended, Alice's testimony that he asked if she knew "Miss Powell" at the school, and the DNA evidence that matched Powell's DNA to DNA found in Alice's underwear.  Although Alice had not been able to identify Powell with total certainty in a photographic lineup, she explained at trial that she had no doubt Powell was the one who robbed and raped her when seeing him in person.

Furthermore, to the extent the challenged evidence might have invoked sympathy for Alice or resentment against Powell, there is no indication it influenced the jury's decision.  The challenged evidence would not have added much to a trier of fact's view of Powell in light of the other evidence demonstrating his callousness in perpetrating the crimes: he repaid Alice's willingness to help him by invading her home, repeatedly penetrating her vagina and anus and forcing her to orally copulate his penis under threat of death, and then stabbing her with a box cutter.  In addition, to the extent any sympathy or prejudice arose from the admission of the challenged evidence, the court instructed the jury not to let bias, prejudice or sympathy influence its decision.

Powell has not demonstrated reversible error in the admission of the evidence concerning Alice's medical condition and treatment.

(Id. at *7-8.)

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986).  The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."  Holley v. Yarborough, 568 F.3d 1091, 1101

United States District Court
For the Northern District of California

(9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established federal law under § 2254(d)).

In the present case, the state appellate court's finding did not contradict or unreasonably apply federal law, because admission of evidence of Alice's breast cancer and treatment did not render the trial fundamentally unfair. <u>See</u> <u>id.</u>  The state appellate court explained that "there was some probative value to the evidence, and the court did not abuse its discretion in admitting it over counsel's relevance objection." (Op. at *7.)  For example, the prosecution was required to prove that Alice did not consent to the sex acts, thus the evidence of Alice's medical condition showed that she failed to resist due to her weakened physical condition. (<u>Id.</u>)

Petitioner argues that the evidence was inflammatory.  He claims that because an impermissible inference could be drawn, it is the only inference that the jury could have drawn.  However, so long as the jury may draw some permissible inference from the evidence, its admission does not violate due process.  <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 920 (9th Cir. 1991).  Moreover, the determination of whether evidence, while being relevant, is prejudicial is a question of state law, and any alleged error under state law does not state a claim cognizable in federal habeas corpus proceedings.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991).  In any case, Petitioner falsely assumes that the evidence at issue should be considered irrelevant simply because it could have been prejudicial.  Because the jury was capable of drawing permissible

**United States District Court**
For the Northern District of California

inferences from this evidence to prove material issues in the present case, and because the state appellate court reasonably did not find the admission of this evidence to be prejudicial, Petitioner's argument that the admission violated his due process rights is unavailing.

Furthermore, Petitioner argues that reversal is required because it was reasonably probable that a more favorable result would have been reached absent the error of admitting this evidence. (Pet. "Argument" at 27.) To the extent that the evidence of Alice's cancer invoked sympathy, it was marginal compared to the overwhelming and not substantially disputed evidence that the Petitioner was the perpetrator of the sexual assault: Alice's ability to identify him at trial, testimony from Alice that Petitioner asked if she knew a "Miss Powell" at the school and evidence that he attended the school, and DNA evidence that matched Petitioner's DNA to DNA found in Alice's underwear. Therefore, absent the admission of evidence of Alice's breast cancer and treatment, it was not reasonably probable that Petitioner would have received a more favorable result.

Accordingly, Petitioner's claim relating to the admission of evidence of Alice's breast cancer and treatment is DENIED.

III. Prosecutorial Misconduct During Closing Argument

Petitioner asserts that his right to due process was violated by improper prosecutorial comments during closing argument. (Pet. "Argument" at 29.) Specifically, Petitioner asserts that the prosecutor made statements to appeal to the sympathy and passions of the jury. (Id. at 33.) The state appellate court summarized the relevant trial court proceedings as follows:

1. Background

    Near the beginning of closing argument, the
prosecutor told the jury: "On October 3rd, 2005, [Alice]
received the label rape victim.  Not by her doing, but
at the hands of one man in the entire world.  And she
will have that title to the day she dies.  [¶]  She will
also have the scars that one cannot see unlike the scars
on her chest from her . . . ."  At this point, Powell's
trial counsel interrupted and asserted the prosecutor's
comments were not a fair comment on the evidence.  The
court directed the prosecutor to move on to something
else after verifying that the prosecutor was referring
to Alice's medical scarring.

    The prosecutor continued: "She didn't deserve these
things to happen to her.  She is the helpful individual.
But, at the hands of somebody else, she will have these
memories to live by.  [¶]  And, unfortunately, they
happened in the place where each and every one of us --
from the day we first come home from the hospital, that
first day we are brought home, that safe and secure
place.  The place where, when we are children and play
games like tag, home is the safe place.  And, when we
are adults, home is where we want to go when we have
that rough day and we want to be by ourselves and relax.
[¶]  But [Alice's] home is no longer her home.  It is a
crime scene.  And she will have that for the rest of her
life.  When she works her second job in her office where
she has her chair where the man raped her, when she goes
and cleans up her floor, she will know the area where
she was on her back when he raped her and then was told
to turn over and he penetrated her again.  When she
sweeps up, she will also see the area where she swept
where she had to clean up her own blood when she goes
into her kitchen every morning."

    Defense counsel objected on the ground the
prosecutor was not fairly commenting on the evidence but
making "an appeal to passion and prejudice."  The court
overruled the objection but invited defense counsel to
renew his objection if he found it necessary.

    The prosecutor next stated, "These are all places
where these events happened, ladies and gentlemen.  And
there is one man who did this."  The prosecutor then
discussed at length the evidence implicating Powell and
each individual charge.  Defense counsel made no further
objections.

(Op. at *8-9.)

    A defendant's due process rights are violated when a misconduct
by the prosecutor renders a trial "fundamentally unfair."  <u>Darden</u>

United States District Court
For the Northern District of California

v. Wainwright, 477 U.S. 168, 181 (1986).  Under Darden, the first

issue is whether the prosecutor's remarks were improper; if so, the

next question is whether such conduct infected the trial with

unfairness.  Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005).

A prosecutorial misconduct claim is decided "'on the merits,

examining the entire proceedings to determine whether the

prosecutor's remarks so infected the trial with unfairness as to

make the resulting conviction a denial of due process.'"  Johnson

v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995).

The state appellate court found that the prosecutor's remarks

were proper based on the following analysis:

### 2. Legal Standard

Prosecutorial behavior violates the federal
Constitution when it is so egregious that it "'"infects
the trial with such unfairness as to make the conviction
a denial of due process."'"  (People v. Gionis (1995) 9
Cal.4th 1196, 1214.)  The behavior violates state law if
it constitutes a deceptive or reprehensible means of
persuading the fact finder.  (People v. Morales (2001)
25 Cal.4th 34, 44.)  While a prosecutor has wide
latitude during closing argument, he or she cannot
personalize the evidence to the extent it amounts to an
appeal to the sympathy and passions of the jury.  (See
e.g. People v. Fields (1983) 35 Cal.3d 329, 362.)  On
the other hand, a prosecutor's argument "'"'may be
vigorous as long as it amounts to fair comment on the
evidence, which can include reasonable inferences, or
deductions to be drawn therefrom.'"'"  (People v. Hill
(1998) 17 Cal.4th 800, 819.)

We must determine whether there is a reasonable
likelihood the jury construed or applied the challenged
comments in an improper or erroneous manner, in light of
the context of the entire closing argument.  (People v.
Frye (1998) 18 Cal.4th 894, 970, overruled on other
grounds in People v. Doolin (2009) 45 Cal.4th 390, 421,
fn. 22; People v. Lucas, supra, 12 Cal.4th at p. 475.)
"'In conducting this inquiry, we "do not lightly infer"
that the jury drew the most damaging rather than the
least damaging meaning from the prosecutor's
statements.'"  (People v. Brown (2003) 31 Cal.4th 518,
553-554.)

### 3. Application

Although the prosecutor told the jury that Alice will view her home as a crime scene and alluded to her medical condition, these prefatory remarks comprised just a small fraction of the entire closing and rebuttal arguments. The overriding thrust of the prosecutor's argument to the jury was that Alice's testimony established the elements of the charged offenses, and Powell's identity as the perpetrator had been established by Alice's testimony and the DNA test results. The essence of the prosecutor's argument, therefore, was that Powell should be convicted because the evidence showed he was guilty. Viewing the prosecutor's argument as a whole, the gratuitous comments of which Powell complains did not create a risk that Powell would be convicted for reasons irrelevant to his guilt, constitute reprehensible behavior, or otherwise inject unfairness into the proceeding. Nor do we see any reasonable likelihood that the jury construed or applied the comments in an improper or erroneous manner. As mentioned *ante*, the jury was instructed that it could not base its verdict on sympathy, bias, or prejudice, and nothing in the record indicates it did.

Powell has failed to establish prosecutorial misconduct.

(Op. at *9-10.)

The state appellate court reasonably found that the prosecutor's comments were unimportant, particularly when considered in the context of the trial as a whole. The prosecutor's comments, even if they were improper, did not rise to the level of a due process violation. Factors considered in determining whether improper comments rise to the level of a due process violation are (1) the weight of evidence of guilt, see United States v. Young, 470 U.S. 1, 19 (1985); (2) whether the misconduct was isolated or part of an ongoing pattern, see Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct related to a critical part of the case, see Giglio v. United States, 405 U.S. 150, 154 (1972); and (4) whether the comments misstated or manipulated the evidence, see Darden, 477

**United States District Court**
For the Northern District of California

1  U.S. at 182.

2      Here, the evidence of guilt as to the sexual assault was very

3  strong.  The prosecutor's comments were relatively isolated in that

4  they occurred only during the beginning of his closing argument and

5  were a small portion of the entire argument.  Lastly, the comments

6  did not misstate or manipulate any of the evidence presented at

7  trial.

8      Accordingly, the prosecutor's comments did not rise to the

9  level of a due process violation.  Therefore, Petitioner's claim of

10  prosecutorial misconduct is DENIED.

11  IV.   Cumulative Error

12      Petitioner claims that the cumulative effect of the errors

13  at his trial denied his constitutional rights.

14      In some cases, although no single trial error is

15  sufficiently prejudicial to warrant reversal, the cumulative effect

16  of several errors may still prejudice a petitioner so much that

17  habeas relief must be granted.  See Alcala v. Woodford, 334 F.3d

18  862, 893-95 (9th Cir. 2003) (affirming district court's conditional

19  grant of habeas relief where multiple constitutional errors

20  hindered the petitioner's efforts to challenge every important

21  element of proof offered by prosecution).  However, where there is

22  no single constitutional error, nothing can accumulate to the level

23  of a constitutional violation.  See Mancuso v. Olivarez, 292 F.3d

24  939, 957 (9th Cir. 2002); Rupe v. Wood, 93 F.3d 1434, 1445 (9th

25  Cir. 1996).

26      Because this Court finds, based on its assessment of

27  Petitioner's claims, no single constitutional error, Petitioner is

28  not entitled to federal habeas relief on his claim of cumulative

error.   Accordingly, this claim for habeas relief is DENIED.

CONCLUSION

For the foregoing reasons, the Court DENIES the petition for a writ of habeas corpus on all claims.

Further, a Certificate of Appealability is DENIED.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

Dated:  6/21/2012

CLAUDIA WILKEN
United States District Judge

24